**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**LAFAYETTE-OPELOUSAS DIVISION**

| | | |
|---|---|---|
| **BARBARA P. STELLY** | * | **CIVIL ACTION NO. 05-0474** |
| **VERSUS** | * | **MAGISTRATE JUDGE HILL** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **BY CONSENT OF THE PARTIES** |

**REASONS FOR JUDGMENT**

The undersigned was referred this social security appeal by consent of the parties. For the reasons set forth below, the Commissioner's decision is **REVERSED,** and claimant is awarded benefits commencing June 11, 2003.

**I.     Background**

The claimant, Barbara P. Stelly ("Stelly"), age 57, filed a claim for supplemental security income payments on June 11, 2003, on the basis that she was disabled due to bipolar disorder, depression, osteoporosis, and kidney problems. She has a ninth-grade education, and past work experience as a cashier and meat counter worker at a grocery store.

Stelly has a history of physical and mental problems. On October 28, 2002, she was admitted to Lafayette General Medical Center ("LGMC") with complaints of abdominal pain. Chest x-rays showed no active chest disease. There was minimal

lumbar spondylosis. Bone density testing on November 27, 2002, showed osteopenia in the lumbar spine and osteoporosis in the hips.

Stelly also complained of kidney problems. On June 5, 2003, she was admitted to Our Lady of Lourdes Hospital with complaints of inability to urinate, for which a catheter was inserted. Two days later, she returned with complaints of nausea, vomiting, and headache. She also reported deterioration of her mental functioning, including forgetfulness, fatigue, and generalized weakness. She stated that she had not been able to keep up with her housecleaning as she had in the past. Her husband and daughter related that Stelly had more trouble driving and doing daily activities recently. Claimant reported going down a one-way street the wrong way and getting into an accident, which was related to lack of attention and concentration.

Dr. Michael Kennedy's impression was acute urinary retention, generalized weakness and subtle neurologic symptoms, and depression and anxiety disorder. On urology consultation, Dr. Chris Fontenot found post-obstructive diuresis with secondary dehydration. He referred Stelly to neurologist Steven Snatic to rule out multiple sclerosis. Dr. Snatic ordered an MRI, which was normal.

On June 10, 2003, Stelly was readmitted for sensory urgency. Dr. Thad Bourque opined that with her history of bipolar disorder and being on Lithium in the past, she was probably just having polydipsia with polyuria as a result. He thought

that in all likelihood, the irritation she was having was probably from the catheterization she had while in the hospital, which he suspected was much of the problem with her frequency.

On August 3, 2004, Stelly was admitted to LGMC with complaints of tightness in her chest. Chest x-rays and an EGC were normal. The impressions were chest pain and vertigo.

Stelly also has a history of mental illness. In September, 2002, she was admitted to LGMC with complaints of nausea and vomiting. While there, she was referred to Dr. Lily Hodges because of depression. On mental status evaluation, Stelly was despondent with fair eye contact, sad facial expression, positive psychomotor retardation, depressed mood, and wishing to die. She felt hopeless, helpless, worthless, had poor appetite, cried constantly, was anxious, had insomnia and anhedonia, and was very co-dependent. Dr. Hodges' impression was bipolar illness and dependent personality traits. Stelly was prescribed Paxil and Ambien for insomnia.

Stelly was evaluated consultatively by Dr. Alfred E. Buxton on September 11, 2003. She reported that she had been married five times, and that her current husband drank and verbally abused her. She complained of a "lot of depression lately." (Tr. 193). She stated that she had been seen by Dr. Hodges once, and had since been

followed monthly by Dr. Salama for the previous year. Her medications included Eskalith CR, Ambien, Panmist LA, Paxil, Patanol, and Actonel.

Claimant's sleep was restless with frequent awakening. Her appetite was good. She had poor energy and libido. Socially, she had fair contact. Her primary hobby or pleasure was crafts and reading. She was able to cook, clean, shop, manage money, travel, communicate, and manage time independently.

On examination, Stelly's verbal receptive and expressive language skills, dress and groom, and social skill were good. Recent and remote memories were intact. Her ability to attend and concentrate was good. Pace was even. Intellect and adaptive daily living skills were within normative limits.

Judgment, reasoning and reflective cognition were good. Insight was fair. Cognation was clear and cogent. Mood was even with congruent affect. Claimant reported no suicidal ideation over the last year. Her self-image was poor with low self-esteem. She presented as being rather passive and dependent. Goal orientation was positive.

Claimant was a chronic worrier. She was easily upset, then tended to fuss and cry. She had frequent crying spells. She noted that she had been molested by her father from ages 5 to 12 years, and continued with occasional intrusive thoughts of these events. She had no treatment for her abuse.

4

Dr. Buxton's impression was bipolar disorder, with degree of impairment moderate and prognosis fair; post-traumatic stress disorder, chronic, with degree of impairment mild to moderate and prognosis fair; a partner relational problem, with degree of impairment moderate and prognosis guarded, and a dependent personality disorder. He noted that continued outpatient mental health intervention would be appropriate, as well as the use of psychoactive medication, then counseling. He stated that this treatment would likely prove to be long-term as opposed to brief.

Stelly's Global Assessment of Functioning score was 60 over the previous 12 months. Dr. Buxton noted that at that point, she might be able to secure gainful competitive employment "but unlikely she would maintain that employment over a protracted period of time as she would not perform in a reliable and dependable fashion secondary to the negative impact of the mental health issues on her functioning." (Tr. 194). He observed that she would deteriorate under the accumulation of everyday frustration and stress, and that one would see exacerbation in overall symptomatology. He stated that at a minimally adequate level, she should be able to establish and maintain mutually rewarding relationships with co-workers and supervisors alike.

Dr. Buxton concluded that "[i]f, and when, she should demonstrate *significant immprovement* in her overall functional status, as revealed through feedback from

5

treating professionals and interventionists, then a referral to Louisiana Rehabilitation Service for assessment, training, and job placement would be appropriate. *Any such referral prior to her demonstrating such significant lasting positive improvement would be premature*." (emphasis added). (Tr. 194).

In the Residual Functional Capacity Assessment (Mental) dated September 24, 2003, Dr. R. H. Rolston determined that Stelly was moderately limited as to her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods, and complete a normal workday and workweek without interruptions. In the Psychiatric Review Technique, Dr. Rolston determined that she had a moderate restriction as to activities of daily living and difficulties in maintaining social functioning. He found that she should be able to obtain a simple job following simple instructions. He noted that her allegations were credible.

Dr. Samir A. Salama had treated Stelly since February 24, 2003. On January 13, 2004, he wrote that her diagnosis was major depression, recurrent, severe.

Stelly was treated at the Dr. Joseph Henry Tyler, Jr. Mental Health Center from July 12, 2004 to September 10, 2004. Her diagnosis was bipolar disorder, post-traumatic stress disorder, hyperlipidemia, and cervical radioculopathy. Her G.A.F. score at that time was 35, and 50 for the previous year.

At the hearing on September 17, 2004, Stelly was 55 years old. She stated that she had last worked as a cashier, and had stopped working because her boss was hard to get along with. She reported that she had worked as a babysitter for a couple of months afterwards.

Stelly testified that she was unable to work because of depression and suicidal thoughts. She reported that she had been hospitalized in September, 2002, after she became suicidal. She said that she was receiving mental health medication monitoring once a week to once a month, and had seen a social worker at Dr. Salama's office for about five months.

Additionally, Stelly complained of kidney trouble, asthma, and osteoporosis. She testified that her kidney problems had stopped after treatment. She also reported neck problems, which caused her to have severe headaches. She was taking Flexeril for pain, and lithium for bipolar disorder.

Regarding activities, Stelly testified that she stayed in her pajamas a lot. She stated that she watched television about six hours a day. She said that she used to go to church, but did not like to be around crowds. She reported that she could fix herself a snack, wash clothes, and grocery shop occasionally.

As to limitations, Stelly stated that she could sit for a couple of hours. She said that she had problems standing sometimes because she did not have a lot of energy.

She reported that she did not walk. She testified that she did not have problems with picking up or handling things, and could probably lift a bag of groceries.

**Law and Opinion**

On appeal, Stelly argues that the ALJ erred: (1) in failing to fully assess her residual mental functional capacity, and (2) in finding that Stelly was capable of maintaining substantial gainful activity. Because I find that the ALJ erred in finding that claimant had the ability to maintain employment, I order that the Commissioner's decision is **REVERSED** and that the claimant be awarded benefits.

In evaluating the medical evidence, the ALJ considered Dr. Buxton's opinion that Stelly might be able to secure gainful competitive employment, but that it was unlikely that she could maintain that employment over a protracted period. (Tr. 22, 194). However, the ALJ omitted the rest of Dr. Buxton's opinion, namely that Stelly should not be referred for assessment, training, and job placement unless and until "she demonstrate[s] *significant improvement* in her overall functional status, as demonstrated through feedback from treating professionals and interventionists." (emphasis added). (Tr. 194). He further stated that "[a]ny such referral prior to her demonstrating such *significant lasting positive improvement* would be premature." (emphasis added).

8

The latest report from Stelly's treating physician, Dr. Salama, dated January 13, 2004, indicates that Stelly is still being treated for major depression, recurrent, severe. (Tr. 216). Since the issuance of this report, Stelly was treated in July, 2004, at Tyler Mental Health Center, where she was diagnosed with bipolar disorder, mixed, severe, and post-traumatic stress disorder. (Tr. 277, 288). At that time, her G.A.F. score was 35, with a score of 50 for the past year, which indicates that she had serious symptoms or a serious impairment in social or occupational functioning. This most recent evidence simply does not support a finding that claimant has undergone such "significant lasting positive improvement" that she is capable of working on a sustained basis. (Tr. 194).

The medical reports from claimant's treating physicians do not indicate that claimant is capable of working on a sustained basis at this time. Even the psychologist retained by the social security administration, Dr. Buxton, determined that it would be unlikely that Stelly "would maintain [] employment over a protracted period of time" based on her mental health issues. (Tr. 194). The medical record completely supports that determination.

A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that she can physically perform certain jobs; it also requires a determination that the

9

claimant can hold whatever job she finds for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (citing *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)). According to all of the sources who personally evaluated her, Stelly would be unable to maintain gainful employment. The ALJ, in his opinion, failed to even address the question of whether Stelly could maintain gainful employment. This record fails to give any indication that claimant could do so; Dr. Buxton specifically believed that she could not. Thus, the ALJ erred in the determination that claimant retains the capacity for work.

Because the ALJ erred in finding that claimant had the ability to maintain employment, it is ordered that the Commissioner's decision is **REVERSED**, and the claimant is awarded appropriate benefits commencing June 11, 2003.

Signed this 13th day of February, 2006, at Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE